IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KENNETH DAVIS, JR. and DAVID HAND, | § § § | |
| Plaintiffs, | § | |
| v. | § | CIVIL ACTION NO. 4:16-CV-00252 |
| | § | |
| INDEPENDENCE CONTRACT DRILLING, INC., | § § | |
| | § | |
| Defendant. | § | |

## ORDER

Plaintiffs Kenneth Davis, Jr., and David Hand (sometimes collectively referred to as "Plaintiffs") have sued Independence Contract Drilling, Inc. ("Independence"), alleging that Independence unlawfully retaliated against them and maintained a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Pending before the Court is Independence's Motion for Summary Judgment [Doc. No. 16]. For the reasons set forth below, the Court hereby GRANTS in part and DENIES in part the Motion for Summary Judgment.

## I.    Material Facts

Taking Plaintiffs' properly adduced evidence as true for purposes of summary judgment, the record shows the following facts. Plaintiffs, who are African-American men, worked for the oil-and-gas drilling firm Independence. Plaintiffs worked on the same drilling rig in West Texas as floorhands, a job that entails performing general maintenance and manual labor. Also on that

rig were Driller Josh Allen, Motorman Josh Faust, and two supervisors: Rig Managers Billy Hays and Eddie Bigner.[1]

Plaintiffs began working for Independence in April 2013. The events giving rise to this lawsuit primarily occurred in July of that year. Nonetheless, Plaintiffs testified that their concerns about racial discrimination on the rig had grown in the months leading up to July. On the first "hitch" (i.e., 14-day work shift), according to Hand's testimony, when Hand initially approached Allen to introduce himself, Hand offered a handshake, but Allen did not turn around. According to Hand, "I sensed something then that something wasn't right," and it "made me think twice of what kind of crew I'm getting on."[2] On the second hitch, another African-American man worked on the rig as a derrickhand for a few days.[3] Before he left after his short stint on the rig, according to Hand, he pulled Hand and Davis "aside and told us that the crew we was on wasn't right and he didn't -- he don't see why we was still working with them guys."[4] The unidentified man said, "Hey, man, these guys are racist."[5] On the third hitch, Hand and Faust drove together to a grocery store, and Hand asked Faust about Allen.[6] According to Hand, Faust said that "[b]efore y'all guys got here, [Allen] always said n****r all the time" and that Allen "had a bad experience with black people before."[7] Faust purportedly said that Allen did not like Davis.[8] Faust also told Hand that

---

[1] Independence's Mot. Summ. J., Doc. No. 16 [hereinafter Independence's Mot. Summ. J.], Ex. B, Decl. of Delores Jones [hereinafter Jones Decl.].
[2] Hand Dep. 66–67.
[3] Hand Dep. 74.
[4] Hand Dep. 76. While this statement and many of the following statements are clearly hearsay, the Court uses them here solely to give the case context.
[5] Hand Dep. 77.
[6] Hand Dep. 79.
[7] Hand Dep. 79–80.
[8] Hand Dep. 81.

Faust's family was in the Aryan Brotherhood and that his family "didn't like n****rs."[9] When they returned to the rig, Hand recounted his conversation with Faust to Davis.[10]

On the fourth hitch, Davis suffered an injury while working when his finger was smashed between the forks of a forklift that Allen was driving.[11] Hand testified that he believes Allen intentionally injured Davis.[12] The crew members became upset after the incident because they had lost their safety bonus, and, according to Hand, "that's when they really started showing their true colors."[13] On July 12th, according to Davis's testimony, the crew was working with drill pipe when either Faust or Allen "didn't give me time to latch the mud bucket to keep the mud and chemicals from spraying on me."[14] Davis was then sprayed or nearly sprayed with mud and chemicals.[15] Davis saw Faust and Allen laughing when he looked into the drill shack and told Hand that he thought one of them was purposely trying to spray him.[16] Davis testified that the spray had enough pressure to knock him down had he not gotten out of the way in time.[17]

On or about the next day, Faust approached Davis and Hand while they were scrubbing the rig and said to Davis, "scrub harder boy."[18] Davis replied, "I'm not a boy. I'm a grown man."[19] Faust then said, "well, you're a boy to me."[20] Hand later discussed the comment with Faust, who

---

[9] Hand Dep. 80, 82.
[10] Hand Dep. 82.
[11] Hand Dep. 85–86.
[12] Hand Dep. 86–87.
[13] Hand Dep. 86.
[14] Davis Dep 67.
[15] Davis Dep. 67–68.
[16] Davis Dep. 67.
[17] Davis Dep. 68. After the incident, Hand spoke with Faust. Hand Dep. 136–37. According to Hand, "Faust told me that Mr. Allen wished that I [Hand] would have got out of the way so he could get that n****r wet." This testimony, however, is hearsay and potentially double hearsay. The Court will accordingly not consider this testimony for purposes of deciding the Motion for Summary Judgment.
[18] Davis Dep. 78.
[19] Davis Dep. 78.
[20] Davis Dep. 78.

said he did not mean the comment to be racial in nature.[21] In addition, Plaintiffs have suggested that their work location, the desert of rural West Texas, contributed to their unease.[22]

In or around July 12th–14th, without their coworkers' knowledge, Plaintiffs gathered at least two recordings from inside the drill shack.[23] Plaintiffs left recording devices in the drill shack while their coworkers were discussing Plaintiffs outside of Plaintiffs' presence.[24] Plaintiffs claim that the recording devices were iPods, while Independence alleges that they were cell phones. Plaintiffs claim the recordings captured their coworkers making racially prejudiced comments.[25] The admissibility of the recordings will be taken up separately in the next section.

On July 13th, Plaintiffs approached Hays and raised some of their concerns, including Faust's "boy" comment and a statement that the first recording captured Allen making.[26] A few days later, Plaintiffs notified Bigner of their concerns.[27] Bigner informed Independence's Human Resources department of the situation.[28] On July 17th, Independence summoned Plaintiffs, Allen, and Faust to Independence's Houston office as part of an investigation into Plaintiffs' allegations.[29] On July 18th, Bob Proffit, Independence's Vice President of Human Resources, interviewed Plaintiffs.[30] Proffit did not listen to the recordings.[31]

---

[21] Hand Dep. 137.

[22] *See* Hand Dep. 80.

[23] Davis Dep. 83, 110, 113–14.

[24] Davis Dep. 99–101, 114.

[25] Davis Dep. 100–01, 114–15.

[26] Hand Dep. 163–64.

[27] Davis Dep. 119–20; Independence's Am. Answer, Doc. No. 13 [hereinafter Independence's Am. Answer] at 2.

[28] Pls.' Compl., Doc. No. 1 [hereinafter Pls.' Compl.] at 3; Independence's Am. Answer at 2.

[29] Pls.' Compl. at 3; Independence's Am. Answer at 2–3; Independence's Mot. Summ. J. at 16.

[30] Pls.' Compl. at 3; Independence's Mot. Summ. J. at 16.

[31] Proffit Dep. 68. Independence claims that "Proffit opted not to listen to the contents of the recording because they were made in Texas without the consent of the parties to the recording, and he was concerned the recordings were illegally obtained." Independence's Mot. Summ. J. at 14. In the portion of Proffit's deposition that Independence cites for that claim, however, Proffit merely testified that he did not listen to the recordings during his investigation. Proffit Dep. 68. Proffit testified that Davis and Hand described the content of the recordings, and Proffit "felt them to be truthful at that moment." Proffit Dep. 68.

At the end of July, Independence terminated Plaintiffs.[32] For both Davis and Hand, Independence's "Employee Status Change Form" states that the employee is being discharged for a policy violation, with the "Comments" portion of the form stating: "use of cell phone on rig floor."[33] Proffit had never before terminated an employee for having a cell phone on a rig,[34] although Proffit had only worked for Independence since March 2013.[35] Proffit testified that the secret recordings were also part of the reason why Independence decided to terminate Plaintiffs.[36] Proffit testified that he spoke with "senior management," namely Executive Vice President of Operations Ed Jacob and General Counsel Philip Choyce, and they reached a consensus that Plaintiffs would be terminated.[37] Independence also terminated Allen and Faust.[38] Plaintiffs subsequently filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and, eventually, this lawsuit.

## II.  The Recordings

Plaintiffs secretly made at least two recordings of conversations between their coworkers, and Independence has objected to the admissibility of the recordings. Plaintiffs made the recordings by leaving their iPods (as stated above, Independence alleges that they were cell phones) in the drill shack at times when Plaintiffs were not physically present. The iPods or cell phones, then, recorded conversations among their coworkers that occurred outside of Plaintiffs' presence. The recordings have not been presented as evidence; rather, Plaintiffs described what they heard on the recordings during their depositions. According to Plaintiffs' depositions, the recordings captured their coworkers making a number of racially prejudiced statements.

---

[32] Davis Dep. 141–42; Independence's Mot. Summ. J., Ex. F, Pl. David Hand's Resp. Interrog.
[33] Pls.' Resp. Independence's Mot. Summ. J., Doc. No. 18 [hereinafter Pls.' Resp.], App. at 50–51.
[34] Proffit Dep. 19.
[35] Proffit Dep. 4.
[36] Proffit Dep. 22–23.
[37] Proffit Dep. 21.
[38] Independence's Reply Supp. Its Mot. Summ. J., Doc. No. 20 [hereinafter Independence's Reply] at 25.

In its Motion for Summary Judgment, Independence alleges that these recordings violated Texas law. In its Reply brief, Independence contends that the recordings are unauthenticated and inadmissible, due in part to the lack of a chain of custody and to possible alterations of the recordings. Independence also avers that "Plaintiffs made no attempt to authenticate the recordings or support their admissibility, instead choosing merely to rely on testimony about the alleged contents of the recordings which recordings contain many hearsay statements on them that Plaintiffs have not attempted to show are admissible."[39] In a Supplemental Reply brief, Independence asserts that the recordings and "evidence derived therefrom" are inadmissible under the Federal Wiretap Act, 18 U.S.C. § 2515. Plaintiffs have argued that the recordings do not violate Texas law.

After reviewing the proffered evidence and applicable law, the Court finds that the recordings and Plaintiffs' testimony regarding their content are not competent summary judgment evidence. Federal Rule of Civil Procedure 56(c)(2) provides that a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." According to the advisory committee's note, "[t]he objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." *See Smith v. Palafox*, 728 F. App'x 270, 275 n.3 (5th Cir. 2018) (citing the advisory committee's note regarding Rule 56(c)(2)).

Here, Independence has objected to Plaintiffs' recording-based evidence on numerous grounds. Plaintiffs, however, have failed to show how the recording-based evidence can be presented in a form that would be admissible in evidence. Independence has objected under Federal

---

[39] Independence's Reply at 18.

Rule of Evidence 901(a), arguing that the recordings have not been authenticated. *See* Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."). Furthermore, Independence argues that the recordings cannot be authenticated, among other reasons, because there is no proven chain of custody, the original recordings have been deleted or edited, Plaintiffs were not present when the recordings were made, and "the tapes are incomplete, confusing, and contain hearsay."[40] Plaintiffs have not responded to these objections or otherwise attempted to authenticate the recordings.

Having failed to authenticate the recordings, Plaintiffs have also not shown how Plaintiffs' testimony about what they heard on the recordings is admissible. Such testimony is, of course, hearsay. Plaintiffs have not shown that their testimony about the content of the recordings can be presented in a form that would be admissible in evidence. The Court accordingly will not consider the recordings or Plaintiffs' testimony about their content when deciding the pending Motion for Summary Judgment.

The Court further notes that one court in this circuit has refused to consider comparable recordings—recordings that secretly captured conversations among the plaintiff's coworkers outside of the plaintiff's presence—as evidence of a hostile work environment. *See Rome–Bienemy v. Children's Hosp.*, No. 14–1020, 2015 WL 8600689, at *7 (E.D. La. Dec. 14, 2015) ("[E]vidence of private conversations that Rome would not have heard but for her decision to listen to audio recordings that someone most likely obtained in violation of the law is also not evidence of workplace harassment. The Court's analysis will only involve the instances of workplace race-

---

[40] Independence's Reply at 18–20.

based conduct that Rome was exposed to as a 'condition' of her employment and that she can testify to first-hand.").

Since Plaintiffs have not shown that the recordings or testimony about their content can be presented in a form that would be admissible in evidence, the Court need not address Independence's arguments that the recordings violate Texas and federal law. In order to survive summary judgment, Plaintiffs will need to show that a genuine dispute as to a material fact exists based on their admissible evidence.

## III. Summary Judgment Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the Court should not grant the motion. *Celotex Corp.*, 477 U.S. at 321–25.

The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248.

## IV.     Title VII: Retaliation

Title VII prohibits an employer from retaliating against an employee who "has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e–3(a). "Title VII affords employees the option of proving a violation through either direct or circumstantial evidence." *Jackson v. Watkins*, 619 F.3d 463, 466 (5th Cir. 2010). Where a plaintiff's case is based on circumstantial evidence, as it is in this case, the Court applies the *McDonnell Douglas* burden-shifting framework. *Id.* (citing *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).

Under the *McDonnell Douglas* burden-shifting approach, the plaintiff first has the burden to establish a prima facie case of retaliation. *See McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). If the plaintiff establishes a prima facie case, then the burden shifts to the employer to articulate a legitimate, nonretaliatory reason for its actions. *Id.* at 557. "If the employer meets its burden of production, the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real . . . retaliatory purpose. To carry this burden, the plaintiff must rebut each . . . nonretaliatory reason articulated by the employer." *Id.*

### A.     Plaintiffs' Prima Facie Case

To establish a prima facie case of retaliation under Title VII, a plaintiff must show: "(1) that the plaintiff engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action." *Brandon v. Sage Corp.*, 808 F.3d 266, 270 (5th Cir. 2015) (quoting *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471 (5th Cir. 2002)). Independence has moved for summary judgment on the grounds that Plaintiffs cannot establish the first element of the prima facie case: that the plaintiff

engaged in activity protected by Title VII.[41] Independence contends that Plaintiffs cannot show the first element because they cannot show that they had a reasonable belief that the practices they were opposing were unlawful.

An "employee has engaged in protected activity when she has (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Taliaferro v. Lone Star Implementation & Elec. Corp.*, 693 F. App'x 307, 309–10 (5th Cir. 2017) (quoting *Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 372–73 (5th Cir. 1998) (quoting 42 U.S.C. § 2000e–3(a))). "The first of these is known as the 'opposition clause;' the second as the 'participation clause.'" *E.E.O.C. v. Rite Way Serv., Inc.*, 819 F.3d 235, 239 (5th Cir. 2016).

The Fifth Circuit has observed that "[e]very Court of Appeals to have considered this issue squarely has held that participation in an internal employer investigation not connected with a formal EEOC proceeding does not qualify as protected activity under the participation clause." *Id.* at 239 n.2 (quoting *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 49 (2d Cir. 2012)); *see also Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 428 (5th Cir. 2000) (finding the participation clause "irrelevant" because the plaintiff had already been terminated by the time he filed his EEOC charge). Plaintiffs have acknowledged that "this Court is obliged by binding precedent to dismiss" their claim under the participation clause because their alleged protected activity was part of an

---

[41] If Independence means to dispute the third element—that a causal link existed between the protected activity and the adverse action—at the prima facie stage, the Court finds that Independence's argument regarding an "intervening cause" (i.e., discovery of Plaintiffs' use of cell phones on the rig and discovery of the recordings) is better addressed at the pretext stage of the *McDonnell Douglas* framework. Even if the Court were to assess causation at the prima facie stage, the Court would find that Plaintiffs have produced more than enough evidence to raise an issue of material fact regarding causation for purposes of the prima facie case. This evidence is described in the pretext inquiry discussed below.

internal employer investigation not connected with a formal EEOC proceeding.[42] Plaintiffs' claim for retaliation under the participation clause is dismissed.

Plaintiffs' claim, then, is based on the opposition clause. To raise a claim under the opposition clause, Plaintiffs are not required to prove that they opposed an employment practice that is actually unlawful under Title VII; rather, they are only required to show a reasonable belief that the opposed practice was unlawful under Title VII. *Byers*, 209 F.3d at 428 (citing *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. 1981)). "In determining what constitutes a reasonable belief that a Title VII violation has occurred," the Fifth Circuit has "emphasized the importance of the 'severity' and 'frequency' of the alleged conduct." *Taliaferro*, 693 F. App'x at 310 (citing *Satterwhite v. City of Houston*, 602 F. App'x 585, 588 (5th Cir. 2015)). The "context in which [the employee] opposed her employer's conduct is one factor to consider in determining whether she had a reasonable belief that Title VII was being violated." *Rite Way*, 819 F.3d at 242.

Plaintiffs have adduced sufficient evidence to show that they reasonably believed the practices they reported to their supervisors were unlawful under Title VII, or at least to raise a question of fact. One of the alleged incidents, when Allen or Faust did not give Davis sufficient time to "latch the mud bucket" and sprayed (or nearly sprayed) him with mud and chemicals, was actually a threat to Davis's physical safety. The spray, according to Davis, had enough pressure to knock him down had he not avoided it in time. After looking over to see Faust and Allen laughing in the drill shack, Davis said he thought one of them was trying to do it on purpose. In addition, on or around the next day, Faust told Davis, "scrub harder boy," as Hand looked on.

---

[42] Pls.' Resp. at 4 n.1. Plaintiffs, however, assert that "the EEOC has taken the contrary position" and state that "[i]n the event that this case someday reaches the Fifth Circuit or the Supreme Court, Mr. Davis and Mr. Hand reserve the right to argue that current precedent, which is binding on this Court, should be overruled." Pls.' Resp. at 4 n.1.

In context, including Faust's earlier statement to Hand (which Hand relayed at least in part to Davis) that Faust's family was in the Aryan Brotherhood and "didn't like n****rs"[43] as well as Faust's statement that Allen "had a bad experience with black people before," Plaintiffs could have reasonably interpreted events on the rig as racially motivated and could have reasonably believed that Title VII was being violated. The severity, or menacing nature, of the alleged discrimination, which included physically dangerous harassment, sets this case apart from cases where courts have found that a plaintiff could not have reasonably believed that the challenged offensive or inappropriate comments gave rise to Title VII liability. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 349 (5th Cir. 2007) (supervisor's references to "ghetto children"); *Taliaferro*, 693 F. App'x at 308, 311 (sexually suggestive text message from a company's owner and president); *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 269–70 (2001) (sexual innuendo in a meeting). Furthermore, while Independence characterizes the challenged conduct as "sporadic,"[44] Plaintiffs had only worked for Independence for a matter of months, giving them a limited denominator of experiences against which the challenged episodes could be "sporadic."

---

[43] Faust's statement pertained to his family's beliefs, and the Court does not impute those beliefs to Faust himself. The comments could nonetheless have an unsettling effect on the hearer, and Hand suggested that they in fact did:

> A. . . . And, then, he went on telling me about his family was in the Aryan Brotherhood.
>
> . . . .
>
> Q. Faust?
> A. Josh Faust told me his family was in the Aryan Brotherhood --
> Q. Okay. Okay.
> A. -- not liking black people.
> Q. Right.
> A. -- and I'm out here in the middle of nowhere in the desert with him.
> Q. And did he tell you about whatever experience Josh Allen had?
> A. . . . he had a bad experience with some black guys before. He didn't tell me where and where he was at when he had it.
> Q: Did he threaten you in any manner?
> A. Josh Faust? No, ma'am. He -- I mean, he just -- sitting here telling me that your family's in the Aryan Brotherhood, I mean, I don't know what's on his mind.

Hand Dep. 80.

[44] Independence's Mot. Summ. J. at 32.

If Plaintiffs, both African-American men, believed that Davis was being physically and verbally targeted based on his race, there is at least a question of fact regarding whether they had a reasonable belief that what they were opposing violated federal antidiscrimination laws. Since Independence has not challenged the second element of Plaintiffs' prima facie case, that an adverse employment action occurred, and Independence has not presented any argument against the third element, the causation element, that would be better addressed at the prima facie stage than the pretext stage, the Court finds that Plaintiffs have shown a prima facie case of retaliation.

### B. Independence's Legitimate, Nonretaliatory Rationale

Once Plaintiffs have established a prima facie case, the burden shifts to Independence to articulate a legitimate, nonretaliatory rationale for terminating Plaintiffs. *See McCoy*, 492 F.3d at 557. "The employer's burden is only one of production, not persuasion, and involves no credibility assessment." *Id.* Independence has articulated two legitimate, nonretaliatory rationales for terminating Plaintiffs: "(1) Plaintiffs violated [Independence's] policy concerning the use of electronic devices in the workplace; and (2) Plaintiffs . . . recorded co-workers on the rig, which amounts to illegal conduct in the workplace."[45] By articulating these legitimate, nonretaliatory rationales, Independence has discharged its burden of production.

### C. Pretext

To survive summary judgment, Plaintiffs must show the existence of a fact question for the jury as to whether "the employer's proffered reason is not true but instead is a pretext for the real . . . retaliatory purpose." *Id.* "To carry this burden, the plaintiff must rebut each . . . nonretaliatory reason articulated by the employer." *Id.* "In order to demonstrate pretext sufficient to defeat a motion for summary judgment, an employee must produce evidence that could lead a

---

[45] Independence's Mot. Summ. J. at 34.

reasonable fact-finder to conclude that the adverse employment action would not have occurred but for the employee's decision to engage in an activity protected by Title VII." *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 427 (5th Cir. 2017) (internal brackets and quotation marks omitted); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . ."). In sum, the "ultimate question is not one of pretext, but whether a reasonable fact-finder could conclude that the employer would not have fired the employee 'but for' the employee's decision to engage in an activity protected by Title VII." *Alkhawaldeh*, 851 F.3d at 428.

Plaintiffs have offered sufficient evidence to create a fact issue as to pretext and the true cause of their terminations.[46] Perhaps the strongest evidence of pretext is the frailty of the cell phone policy rationale itself. Proffit testified that he had never before terminated an employee for violating the cell phone policy.[47] Independence responds that the company had only begun operations slightly over one year before Plaintiffs' terminations and that Proffit had only worked at Independence since March 2013. The fact that Plaintiffs were the first employees terminated for violating the cell phone policy nonetheless has probative value with respect to pretext.

Proffit's testimony also suggests that he was unsure whether the cell phone policy was actually being enforced on the rigs, which further raises questions about Independence's grounds for terminating Plaintiffs. When asked if he had investigated "whether other people were using a cell phone out on that rig," Proffit responded: "I didn't investigate every -- you know, every

---

[46] This is true even assuming *arguendo* that the recording devices were cell phones rather than iPods. Plaintiffs maintain that they were iPods.
[47] Proffit Dep. 19–20.

employee out there, no."[48] Proffit was next asked if he had investigated "whether this rule against cell phones was being enforced at the rig," and he responded: "I don't know the answer to that."[49]

Certain portions of Plaintiffs' testimony indicate that the rules around cell phones on the rig were not commonly known or strictly enforced, despite what the company policy might have said or what training sessions may have instructed. Hand was asked: "as of the time that you were still employed at [Independence], what knowledge, if any, did you have of the cellphone policy?" He answered, "The only knowledge I had on -- of a cellphone policy was the date I got hired and it was revised in 2012 about a cellphone policy, that I can use it through meals and breaks."[50] Davis was asked: "Do you think, sitting here today, that it's a big deal that it was an iPod versus a phone that you were recording with?" He answered, ". . . no ma'am. The policy I got stated you can have a cellphone during breaks and mealtime. It placed no geographical location of where you could take your phone or whatever."[51]

Proffit's testimony that "everybody in the drilling industry knows that you can't have a cell phone on the rig . . . except the rig manager"[52] seemingly conflicts with Plaintiffs' unawareness of that prohibition. Proffit may well have believed that the prohibition on having a cell phone on a rig was commonly known. At this stage, however, the Court cannot weigh Plaintiffs' testimony against Proffit's to assess whether having a cell phone on a drilling rig was a serious, well-known prohibition.

Furthermore, Independence employee Jason Maddox testified that cell phone use on the rig was common during Plaintiffs' employment with Independence:

---

[48] Proffit Dep. 18–19.
[49] Proffit Dep. 19.
[50] Hand Dep. 217–18.
[51] Davis Dep. 118–19.
[52] Proffit Dep. 18.

A. I knew after, you know, David [Hand] had gotten fired, he had told me why they got fired for violation of the cellphone policy.

Q. All right. Did that surprise you?

A. Kind of, yes.

Q. Why is that?

A. Because it was -- I mean everybody used their cellphones and nobody ever got written up for their cellphones. It was common that we had our phones on us and sometimes the rig manager, if they couldn't get us, would call us or message us on our cellphones.[53]

It was only several months after Plaintiffs' terminations, according to Maddox, that the cell phone policy was revised "to keep the cellphones off of the rig floor and 75 feet away from the well."[54]

Given this evidence, a reasonable jury could believe that terminating employees for having cell phones on the rig after their first violation, without verifying whether that policy was actually being enforced, shows that another motive was at work, especially considering the evidence that "everybody" had cell phones on the rig.

With respect to the illegal recording rationale, Plaintiffs have introduced evidence calling into question when Independence began to rely on this rationale. To the extent there is evidence that Independence only began articulating this rationale later, after it had terminated Plaintiffs purportedly because they had cell phones on the rig, this evidence undermines both of the legitimate, nonretaliatory rationales that Independence has articulated. "[A]n employer's inconsistent explanations for its employment decisions at different times permits a jury to infer that the employer's proffered reasons are pretextual." *Burrell*, 482 F.3d at 412 n.11 (citing *Gee v. Principi*, 289 F.3d 342, 347–48 (5th Cir. 2002)); *see also Caldwell v. KHOU–TV*, 850 F.3d 237, 242 (5th Cir. 2017) ("An employer's inconsistent explanations for an employment decision 'cast

---

[53] Maddox Dep. 12–13.
[54] Maddox Dep. 11–12.

doubt' on the truthfulness of those explanations."). The Fifth Circuit, however, has observed that "in those cases in which we have focused on inconsistent rationales, there has been otherwise strong evidence of pretext." *Bennett v. Consol. Gravity Drainage Dist. No. 1*, 648 F. App'x 425, 430 (5th Cir. 2016).

To question the illegal recording rationale, Plaintiffs have offered Independence's Employee Status Change Forms for both Hand and Davis.[55] Under the heading "REASON FOR DISCHARGE," the box for "Policy Violation" is marked. Under the heading "COMMENTS," both forms have the same handwritten note: "use of cell phone on rig floor." The forms indicate that they were prepared by a "HR Coordinator" and approved by a "Manager of Human Resources." The Manager's signature is dated July 30th, 2013.

The contemporaneous evidence—i.e., evidence from the time that Independence actually terminated Plaintiffs—thus only points to the "use of cell phone on rig floor" rationale. Although Proffit testified that part of the reason why Plaintiffs were terminated was that they recorded conversations held outside of their presence,[56] this deposition testimony in March 2017 does not undercut Plaintiffs' position that Independence first cited only the cell phone policy and later introduced the illegal conduct rationale.

Independence argues that it has not presented inconsistent rationales; rather, it presented the rationale that Plaintiffs "violated [Independence's] cell phone policy" and then offered the consistent, more detailed rationale that Plaintiffs were "using their cell phones in violation of [Independence] policy."[57] Independence's argument is plausible, but Plaintiffs nonetheless have evidence that their terminations were purportedly based, at the time, on their "use" (which can

---

[55] Pls.' Resp., App. at 50–51.
[56] Proffit Dep. 22–23.
[57] Independence's Reply at 11 (italics and underlining omitted).

reasonably be taken to mean "possession") of cell phones on the rig rather than on their allegedly illegal conduct. Plaintiffs make a plausible argument as well: Independence began relying on a new rationale, one based on Plaintiffs' allegedly illegal conduct, once it became clear that the cell phone policy rationale was not convincing. The Court is not deciding today whether Plaintiffs are correct that Independence's rationales have shifted or whether Independence is correct that they have not; rather, the Court finds that there are plausible arguments on both sides and Plaintiffs have some evidence of inconsistency. This uncertainty in the pretext inquiry weighs against deciding this case at the summary judgment stage.

Plaintiffs, in addition, call attention to Independence's reference to the "Company's Social Media Policy" in its May 2014 Statement of Position to the EEOC. Independence wrote: "The Company's Social Media Policy further prohibits the use of cell phones to take pictures, record, and post content without approval by the Company's management."[58] Plaintiffs juxtapose this reference with Proffit's testimony after he was asked, "Did you ever determine that Mr. Davis or Mr. Hand violated anything in this social media policy; and, if so, what?" Proffit responded, "I don't recall."[59] The reference to the Social Media Policy in the Statement of Position is certainly brief, but given that Proffit was seemingly unaware of the role of that policy in this case, it has some probative value as to pretext when joined with the other evidence of Independence's arguably inconsistent, or least evolving, rationales for terminating Plaintiffs.

Lastly, there was a brisk chain of events leading from Plaintiffs' complaint on July 13th to the meeting in Houston on July 18th to Plaintiffs' terminations before the end of the month. Although "[t]iming standing alone is not sufficient absent other evidence of pretext," the "combination of suspicious timing with other significant evidence of pretext, can be sufficient to

---

[58] Pls.' Resp., App. at 46.
[59] Proffit Dep. 13.

survive summary judgment." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 240 (5th Cir. 2015) (quoting *Boyd v. State Farm Ins. Cos.*, 158 F.3d 326, 330 (5th Cir. 1998) and *Evans v. City of Houston*, 246 F.3d 344, 356 (5th Cir. 2001)). Here, Plaintiffs' evidence of temporal proximity adds weight to their other evidence of pretext. The fact that Plaintiffs were terminated shortly after their complaints, as well as the fact that Independence also terminated Allen and Faust, is evidence that Independence was attempting to promptly "clean house" by discharging both the offending individuals and the employees who had reported the potential Title VII violations on the rig.

The Court finds that there is a triable question of fact regarding whether Independence's stated rationales for terminating Plaintiffs are merely a pretext for unlawful retaliation and whether Plaintiffs would not have been terminated but for their internal complaints of discrimination.

## V.    Title VII: Hostile Work Environment

"To state a hostile work environment claim under Title VII, the plaintiff must show that: (1) the victim belongs to a protected group; (2) the victim was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment affected a term, condition, or privilege of employment; and (5) the victim's employer knew or should have known of the harassment and failed to take prompt remedial action." *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 399 (5th Cir. 2007). Independence has moved for summary judgment on Plaintiffs' hostile work environment claim, contending that Plaintiffs cannot show the fourth or fifth elements of their claim.

### A.    Harassment Affecting a Term, Condition, or Privilege of Employment: Applicable Law

With respect to the fourth element, "Harassment affects a 'term, condition, or privilege of employment' if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Hernandez v. Yellow Transp., Inc.*,

670 F.3d 644, 651 (5th Cir. 2012) (citing *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)).

"For harassment to be sufficiently severe or pervasive to alter the conditions of the victim's employment, the conduct complained of must be both objectively and subjectively offensive." *WC&M Enters.*, 496 F.3d at 399.

"To determine whether the victim's work environment was objectively offensive, courts consider the totality of the circumstances, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance . . . ." *Id.* Another factor is "whether it unreasonably interferes with an employee's work performance." *Hernandez*, 670 F.3d at 651 (quoting *Ramsey*, 286 F.3d at 268). "No single factor is determinative." *WC&M Enters.*, 496 F.3d at 399. "Under the totality of the circumstances test, a single incident of harassment, if sufficiently severe, could give rise to a viable Title VII claim as well as a continuous pattern of much less severe incidents of harassment." *Id.* at 400.

### B. Harassment Affecting a Term, Condition, or Privilege of Employment: Discussion

Plaintiffs' competent summary judgment evidence that could conceivably show a hostile work environment is: (1) the purported attempt by Allen or Faust to deliberately spray Davis with mud and chemicals while the crew was working with drill pipe, after which Davis observed Allen and Faust laughing; (2) Hand's testimony that he believes Allen intentionally injured Davis's hand with a forklift; (3) Faust's "scrub harder boy" comment to Davis; (4) Faust's statements to Hand that Allen "had a bad experience with black people before," that "[b]efore y'all guys got here, [Allen] always said n****r all the time," that Faust's family was in the Aryan Brotherhood, and that Faust's family "didn't like n****rs"; and (5) the unidentified man's statement to Hand and

Davis that the crew was racist. The Court cannot consider Plaintiffs' testimony about the content of the recordings for the reasons stated in Part II above.

The Court will take Plaintiffs' evidence in turn. First, the evidence that Allen or Faust acted intentionally when Davis was sprayed or nearly sprayed with mud and chemicals is speculation based upon the fact that Davis saw Allen and Faust laughing when he looked into the drill shack after the incident. The laughter, however, does not show that the incident was intentional. Even assuming the incident was intentional, there is no admissible evidence that it was race-based harassment rather than workplace horseplay. On the other hand, the physically threatening nature of the incident—the fact that the spray had the potential to knock Davis down had it hit him—is a relevant factor. *See id.* at 399 (To determine whether the victim's work environment was objectively offensive, courts consider the totality of the circumstances, including . . . (3) whether [the discriminatory conduct] is physically threatening or humiliating, or merely an offensive utterance . . . ."). There is nonetheless little, if any, admissible evidence that the conduct was discriminatory.

Second, Hand testified that he believed Allen had intentionally injured Davis's hand with a forklift,[60] but again there is no direct evidence corroborating Hand's belief. In fact, the evidence

---

[60] Hand's testimony is not completely clear on this point—i.e., his belief that Allen intentionally injured Davis with the forklift. Viewing the evidence in the light most favorable to Plaintiffs (the non-movants), however, Hand's testimony does articulate such a belief, and the Court will accordingly consider it. The relevant portion of Hand's deposition reads:

> Q. Okay. So, tell me about when you -- when you say things got stirred up when he got his finger messed up?
>
> A. Well, we was -- I think we was -- after the rig move, we was actually lifting up the sub structure of the rig. And Mr. Davis was there and I was there trying to set a pin in to lift the rig -- the sub structure up. And Mr. Allen was on the forklift and Mr. Faust was there, but his finger got smashed between the forks. And, you know, I checked on him and Mr. Allen never did. He just told him go to the pusher shack like that in a mean voice.
>
> But, then, everybody started getting upset because Mr. Davis got hurt, well, that cost us the safety bonus. So, then, that's when they really started showing their true colors.
>
> . . . .
>
> Q. Have you been on rigs before where someone's gotten hurt and the crew didn't get their safety bonus?

reveals that everyone was disappointed that Davis was hurt because it cost them a safety bonus. The evidence does not demonstrate that the incident was something other than an ordinary injury on a drilling rig. Third, the incident in which Faust told Davis to "scrub harder boy" is indeed evidence of race-based, objectively offensive conduct. Although Faust later said he did not mean for the comment to be racial, a reasonable jury could believe the comment represents an instance of racial harassment. A review of Plaintiffs' evidence of race-based harassment, then, has shown one instance of such harassment (the "scrub harder boy" comment) and two incidents (the spraying and forklift incidents) that could conceivably have been racially motivated, although there is a dearth of evidence to that effect.

Plaintiffs' remaining evidence has limited, if any, probative value when it comes to showing "severe or pervasive" discrimination. Faust's alleged statements to Hand—namely that Allen "had a bad experience with black people before," that "[b]efore y'all guys got here, [Allen] always said n****r all the time," that Faust's family was in the Aryan Brotherhood, and that Faust's family "didn't like n****rs"—understandably may have been unnerving to Hand (and Davis, when he learned of them), but they are not necessarily probative of a workplace severely or pervasively infected with discrimination.

If offered for their truth, these statements are hearsay. If offered merely as examples of harassment (regardless of whether the statements are factually true), the statements still do not give

---

A. Yes, I have.
Q. And in those circumstances, the guys are disappointed they're not getting safety bonuses?
A. Guys get upset about it; but, I mean, there's no reason to be doing discrimination or racism.
Q. So they -- so even in your prior work experiences, the guys get upset about it, correct?
A. Yeah, they get upset.
Q. But, in this situation, you believe that any alleged discriminatory acts stemmed from the fact they didn't get their safety bonus?
A. No -- yeah, I believe they -- I believe he was discriminated because he didn't like him and at the same time I believe he hurt him intentionally, too.

Hand Dep. 85–87.

rise to a hostile work environment claim in and of themselves. One of the statements describes a working situation "[b]efore y'all guys got here." Two of the statements describe Faust's family and not Faust himself. The N-word is "perhaps the most offensive and inflammatory racial slur in English, . . . a word expressive of racial hatred and bigotry," *Vess v. MTD Consumer Grp., Inc.*, No. 18-60154, – F. App'x –, 2019 WL 168552, at *4 (5th Cir. Jan. 10, 2019) (quoting *Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001)); nonetheless, according to Hand's testimony, Faust did not call him the word, but rather used it while describing Allen's behavior before Plaintiffs started working on the rig and the prejudices of Faust's family. Faust did not say that he shared his family's prejudices, and the Court will not impute his family's alleged beliefs to Faust himself. Lastly, Faust's statement about Allen's "bad experience" with African-American people, also made while Faust and Hand were driving to a grocery store, may well have been disturbing to Hand, but one coworker's statements about another coworker's alleged past experiences may or may not itself be harassment.

If Faust made these statements to Hand in order to subtly harass or intimidate him, then the statements would, of course, constitute harassment. There is no evidence, however, that Faust had an untoward underlying motive. As it stands in hindsight, the statements may have been ill-advised or inappropriate to share with a coworker, but they are not the type of racial harassment per se seen in other Title VII cases, including cases where summary judgment against the plaintiff has been affirmed. *See Brooks v. Firestone Polymers, L.L.C.*, 640 F. App'x 393, 399 (5th Cir. 2016) (finding that racial slurs, "'black faces' drawn in the bathroom stalls" that were not promptly painted over, and a manager's purported statement "that as long as he was in charge of a certain unit, 'there would be no blacks in the control room'" were "reprehensible" but insufficient to survive summary judgment on a hostile work environment claim); *Frazier v. Sabine River Auth. La.*, 509 F. App'x

370, 372, 374 (5th Cir. 2013) (finding that where a coworker used the word "n****r" and where a coworker "made a noose and gestured as though he was hanging it around another co-worker's neck," the episodes "were isolated and not severe or pervasive enough to support a hostile work environment claim").

The statement by the unidentified African-American man that "these guys are racist" is not evidence of a hostile work environment. The statement is merely a conclusory allegation, and it is hearsay if offered for its truth. Similarly, that Allen purportedly did not turn around to shake Hand's hand when Hand arrived at the rig may have had a subjective effect on Hand but is not evidence of objectively offensive harassment. This theme—that comments or conduct may have been subjectively concerning to Plaintiffs but are not evidence of an objectively offensive work environment—runs through much of Plaintiffs' evidence.

After reviewing Plaintiffs' competent summary judgment evidence, the Court finds that Plaintiffs' evidence falls short of creating a fact issue on the fourth element of their claim. The specific factors that courts use to assess whether working conditions were objectively offensive overall counsel against finding a fact issue. *See WC&M Enters.*, 496 F.3d at 399; *Hernandez*, 670 F.3d at 651 (quoting *Ramsey*, 286 F.3d at 268). The few acts of what could be considered objectively discriminatory conduct were not frequent, especially given that Plaintiffs have not offered evidence of discrimination against them during their first two hitches (setting aside the unsupported assumption that Allen's alleged failure to turn around to shake Hand's hand was racially motivated). The only evidence from their third hitch is the conversation that Hand and Faust had on their trip to a grocery store. The remaining evidence comes from the fourth hitch.

Next, the degree of severity of the conduct is limited by the lack of evidence that much of the alleged conduct was necessarily discriminatory, as described above. Plaintiffs would need

significantly more evidence than Faust's "scrub harder boy" comment to survive summary judgment. *See Cavalier v. Clearlake Rehab. Hosp., Inc.*, 306 F. App'x 104, 105–07 (5th Cir. 2009) (affirming summary judgment against an African-American plaintiff where a coworker purportedly twice called him "boy" and "once told him that she would 'beat the tar off of him'").

As for whether the discriminatory conduct was physically threatening or humiliating, the evidence shows conduct that was physically threatening (i.e., the failure to shake hands, spraying, and forklift incidents), but there is, again, only vague speculation that the physically threatening conduct was racially discriminatory. Lastly, the evidence does not reveal to what degree the alleged discrimination interfered with Plaintiffs' work performance prior to their termination. The Court cannot credit the interference-with-work-performance factor in Plaintiffs' favor based upon assumptions or speculation.

The Court finds that the evidence in the record is insufficient to create a triable question of fact as to whether the alleged harassment affected a term, condition, or privilege of employment. Independence is accordingly entitled to judgment as a matter of law on Plaintiffs' hostile work environment claim.[61]

---

[61] Independence also contends that Plaintiffs cannot show the fifth element of a hostile work environment claim: that the victim's employer knew or should have known of the harassment and failed to take prompt remedial action. A plaintiff is only required to show the fifth element if the harasser does not qualify as a "supervisor," *Matherne v. Ruba Mgmt.*, 624 F. App'x 835, 840 (5th Cir. 2015) (citing *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999)), as that term has been defined by the Supreme Court. *See Vance v. Ball State Univ.*, 570 U.S. 421, 424, 431 (2013). Here, Independence has offered undisputed evidence showing that Allen and Faust could not hire, fire, promote, or take other "tangible employment actions" and were therefore not supervisors under the *Vance* definition. *See* Jones Decl. Plaintiffs concede that this is a case "in which the harassers do not have true supervisory power over the plaintiffs." Pls.' Resp. at 25.

Because the alleged harassers were not supervisors, Plaintiffs must show the fifth element. Independence argues that Plaintiffs cannot show that it failed to take prompt remedial action because Independence promptly investigated the complaints of harassment within days. Moreover, Independence states that it ultimately terminated Allen and Faust, and Plaintiffs do not contest that statement. Pls.' Resp. at 25; Independence's Reply at 25. Plaintiffs, by contrast, argue that Independence's actions cannot qualify as remedial because Plaintiffs were terminated as well. According to Plaintiffs, Independence's actions did not remedy anything *for them*. While many cases only speak in terms of prompt action, which was certainly the case here, *see, e.g., WC&M Enters.*, 496 F.3d at 399 (stating the fifth element in terms of an employer's failure to take "prompt remedial action"), the Court is aware of language in some hostile work environment cases that implies the prompt action must benefit the actual plaintiff. *See Williams-Boldware v. Denton Cty.*, 741 F.3d 635, 640 (5th Cir. 2014) ("A defendant may avoid Title VII liability when harassment

## VI.    Conclusion

For the reasons stated above, the Court hereby GRANTS Independence's Motion for Summary Judgment with respect to Plaintiffs' hostile work environment claim and Plaintiffs' retaliation claim under the participation clause. The hostile work environment claim and retaliation claim under the participation clause are dismissed. The Court DENIES the Motion with respect to Plaintiffs' retaliation claim under the opposition clause. The case will be set for trial.

Signed at Houston, Texas, on this _14_ day of March, 2019.

ANDREW S. HANEN
UNITED STATES DISTRICT JUDGE

---

occurred but the defendant took 'prompt remedial action' to *protect the claimant*." (emphasis added)). This Court need not decide whether the language from the cases differs in any substantive or material way, nor need it decide whether Plaintiffs have raised a fact issue as to the fifth element of their claim because the Court has already found that Plaintiffs cannot raise a fact issue as to the fourth element. Furthermore, Plaintiffs' complaints about their terminations are the essence of their retaliation claim. The Court has already held that their retaliation claim survives summary judgment.